UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DEBRA BAGGETT, ET AL.,              )
        Plaintiffs,                 )
                                    )
        v.                          ) C.A. No. 11-30223-MAP
                                    )
MICHAEL J. ASHE, JR., ET AL.,       )
        Defendants.                 )


MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY
JUDGMENT
(Dkt. Nos. 156 & 171)

August 26, 2014

PONSOR, U.S.D.J.

## I.   INTRODUCTION

Plaintiff Debra Baggett represents a class of 178
former and current inmates of the Western Regional
Women's Correctional Center, who have brought suit
under 42 U.S.C. § 1983 against Defendants Michael Ashe,
Jr., Hampden County Sheriff, and Patricia Murphy,
Assistant Superintendent.[1]  Plaintiff claims that
Defendants' policy of permitting male officers to
videotape female inmates being strip-searched upon
transfer to the segregation unit violated the Fourth
Amendment.

---

[1]   Though this case is a class action, the court, for
simplicity's sake, refers to Plaintiff in the singular
throughout this memorandum.

Defendants have moved for summary judgment, (Dkt. No. 156), and Plaintiff has cross-moved for summary judgment or, in the alternative, for partial summary judgment on the legal issue of whether any legitimate, penological interest justified assigning males officers to videotape the strip searches, (Dkt. No. 171). Plaintiff presents two theories in support of judgment in her favor. First, she contends that the policy of permitting male guards to be present to videotape the strip searches –- even if they somehow refrained from actually viewing the inmates while performing the videotaping -- violated the Constitution. The court agrees that this policy violated the class members' constitutional rights and that no legitimate, penological interest justified it. Moreover, Defendants are not entitled to the protection of qualified immunity for this violation.

Given this, it will be unnecessary for the court to address in detail Plaintiff's second contention, that the policy foreseeably resulted in male officers actually viewing strip searches of female inmates and that such viewing constituted a violation Plaintiff's constitutional rights under clearly established law. Plaintiff is correct that at the relevant time period, clear authority established that, if such viewing did

-2-

occur in a manner that was more than incidental or inadvertent, it violated the Constitution and Defendants would not be shielded by qualified immunity. If the court needed to address this second theory of recovery, however, a trial would be necessary in order to determine whether <u>actual</u> viewing, as opposed to videotaping without looking, occurred.  It would also be necessary to determine whether Defendants were legally responsible for the actual viewing.

In sum, because Plaintiff will prevail on her predominant claim, the court will deny Defendants' motion for summary judgment and allow Plaintiff's motion on the issue of liability.  Further proceedings will be necessary to determine the appropriate potential equitable relief and monetary damages.

## II.  <u>FACTUAL BACKGROUND</u>[2]

Plaintiff, Debra Baggett, was a prisoner at the Western Massachusetts Regional Women's Correctional Center ("WCC") from September 5, 2008, through September 12, 2008, and again from October 2, 2008, through January 28, 2010.  She represents a class of

---

[2]  Unless otherwise noted, the facts are drawn from Defendants' Statement of Material Facts (Dkt. No. 160), Plaintiff's Statement of Material Facts (Dkt. No. 173), Plaintiff's Counter Statement of Material Facts (Dkt. No. 174), and Defendants' Counter Statement of Material Facts (Dkt. No. 195), along with the documents referenced therein.

approximately 178 former and current inmates of the WCC who, upon transfer to the segregation unit, were subjected to a strip search videotaped by male correctional officers. As noted, Defendants are Michael J. Ashe, Jr., the Sheriff of Hampden County, and Patricia Murphy, Assistant Superintendent in charge of the WCC.

The WCC is an all-female facility that houses detainees and sentenced prisoners from the four western counties of Massachusetts. If a prisoner presented as a suicide risk, committed certain disciplinary infractions, or needed to be in protective custody, she was transferred to the segregation unit to separate her from the general population.

The WCC maintained a set of policies that governed the transfer of prisoners into that unit, specifically Policy and Procedure ("P&P") 3.1.7. A transition team headed by Defendant Murphy wrote the policies, though Defendants Ashe and Murphy discussed them while they were being drafted. There is no dispute that Ashe and Murphy were responsible for the policy. During the process, the team also relied on an expert consultant, John Milosovich. The policy was updated nearly every year, though its central tenants remained the same. (Murphy Aff. (Defs.' Ex. D), Dkt. No 164, Exs. 1-6.)

The policy adopted by Defendants required, at a minimum, four officers to move an inmate to segregation. The officers effectuated the move by cuffing the inmate's wrists, shackling her ankles, conducting a pat search, and leading her into the unit. If an inmate were not compliant, additional officers would assist. Any inmate transferred into the unit was subject to a strip and body cavity search. This required the inmate to run her fingers through her hair, remove dentures if she wore them, raise both arms, lift her breasts, lift her stomach for visual inspection if she had a large mid-section, and remove any tampon or pad if she were menstruating. She was then required to turn around, bend over, spread her buttocks, and cough.

The policy also specified the location of the strip searches. They would occur either in the individual segregation unit itself or in the segregation intake room. If the search occurred in the individual cell, at least two female officers would remain with the prisoner during the search. If the supervisor were female, she would also remain in the cell. However, if the supervisor were male, the policy dictated that he "remain[] in the cell but stand[] in the doorway." (Murphy Aff. (Defs.' Ex. D), Dkt. No 164, Ex. 1.)

Alternatively, if the search occurred in the intake room, the entire transfer team would remain in the room.

One officer was responsible for videotaping the transfer from the beginning of the move through, and including, the strip search. The filming officer was expected to stand just outside of the cell and point the camera in the direction of the inmate. From 2007 to 2010, the policy stated that if a male officer held the camera, he was to "stand[] outside the cell facing the Dayroom [away from the cell] with the camera pointing inside the cell and record[ing] the prisoner from the neck up." (Murphy Aff. (Defs.' Ex. D), Dkt. No 164, Exs. 1 & 2.) From 2010 to 2012, the policy required "the officer operating the video camera, if male, [to] stand[] outside the cell with the camera pointing inside the cell and record[ing] the prisoner." (Murphy Aff. (Defs.' Ex. D), Dkt. No 164, Exs. 3-4.) Since March 2012, the policy mandated that male officers operating the camera stand "outside the cell and position[] the camera on the prisoner from the neck up . . . then turn[] his head to the side to afford the prisoner as much privacy as possible." (Murphy Aff. (Defs.' Ex. D), Dkt. No 164, Ex. 5.)

-6-

In other words, male officers filming the strip search were required under the policy to conduct the filming while attempting to avoid looking at the subject being filmed and, at the same time, taking care to film the unseen inmate only from the neck up. According to Plaintiff, when this section of the policy was being drafted, Mr. Milosovich questioned the need for the videotaping at all and expressed doubts that male guards, as a practical matter, could consistently follow the very awkward procedure as it was prescribed. (Dkt. No. 175, Ex. 28 at 15 (stating "how can you be sure that [the camera] will stay from the neck up . . . Suggest someone check to make sure a strip search can be video taped at all").)

Since September 15, 2008, a male guard has held the camera during 274 strip searches. For 90% of these searches, two or more female guards were in the cell, and during 58%, three or more females were present. During that period, Defendants employed on the security staff roughly 31 female officers and 49 to 54 male officers. According to Plaintiff, several women complained to WCC staff about the cross-sex videotaping policy.

In May 2010, Plaintiff's counsel sent a letter to Defendants, informing them that he believed this policy

was unconstitutional. Around the same time, Defendants altered P&P 3.1.7 to restrict the circumstances under which male officers could operate the camera. Female officers were required to do the videotaping unless "impracticable." (Murphy Aff. ¶ 110 (Defs.' Ex. D), Dkt. No. 164, Ex. 3.) Between May 2010 and September 2011, male officers held the camera 26% of the time. Since September 2011, when this suit was filed, males have held the camera only 2.5% of the time. From January 1, 2013 to July 31, 2013, a male held the camera only one time out of 96 total transfers.

Though it is undisputed that male officers operated the cameras, the parties vigorously dispute whether males actually viewed the female inmates during the searches and, if they did, whether such viewing was more than incidental or inadvertent. Plaintiff relies on the testimony of five members of the class who discussed their experiences. They described their observations of male officers viewing them during strip searches. As Plaintiff herself testified, "Sometimes I could see their eyes and . . . sometimes the camera was obscuring the face but I almost always could see their face." (Baggett Dep. 279:13-19, Dkt. No. 175, Ex. 13 at 2.) She further said, "They were looking at me, at my direction, their faces were pointed and their

-8-

postures and everything were pointed directly at me."
(Id. 281:17-22.)  Plaintiff also provides testimony
from a former WCC corrections officer who claimed that
male officers would simply "stand off to the side and
just watch the viewfinder."  (Matlasz Dep. 53:11-15,
Dkt. No. 175, Ex. 5 at 4.)

        Moreover, Plaintiff points to the videos
themselves, 68% of which show some or all of the
women's genitals, buttocks, or breasts, and 82% of
which show some portion of the women below the neck.
Based upon the steadiness of the camera and the footage
of the inmates' bodies, she believes that a male
officer had to be facing the inmates (or watching
through the viewfinder) to keep the camera as still as
it was and trained on the correct area in the cell.

        Defendants, meanwhile, provide testimony from 11
former and current officers who state that they never
witnessed a camera operator actually viewing a search.
More broadly, Defendants believe that Plaintiff's
evidence is insufficient to establish anything more
than incidental viewing.

        On September 15, 2011, Plaintiff filed this one-
count complaint against Defendants alleging a violation
of 42 U.S.C. § 1983.  This court, on May 23, 2013,
certified a class of "approximately 178 former and

-9-

current WCC inmates who were videotaped by male correctional officers during strip searches." (Dkt. No. 86.)

On February 21, 2014, Defendants filed their Motion for Summary Judgment (Dkt. No. 156), and Plaintiff cross-filed on March 19, 2014 (Dkt. No. 171). As noted, Plaintiff also moved, in the alternative, for partial summary judgment on the issue of whether any true emergency or other legitimate, penological interest justified assigning male officers to videotape the strip searches. On April 22, 2014, the court heard argument on the motions and took the matter under advisement.

### III. DISCUSSION

On summary judgment, the facts and all reasonable inferences that might be drawn from them are viewed in the light most favorable to the non-moving party. <u>Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.</u>, 396 F.3d 584, 588 (1st Cir. 2004). When addressing cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1 (1st Cir. 1997). Summary judgment is appropriate if no

genuine dispute of fact exists and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Plaintiff only offers one count in this lawsuit -- a violation of § 1983.  To succeed on this claim, "the challenged conduct must be attributable to a person acting under color of state law . . . [and] the conduct must have worked a denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997).  The law also "requires the plaintiff to prove not only a deprivation of federal right, but also that the defendant's conduct was a cause in fact of the alleged deprivation."  Id. at 1062.

The first element is undisputedly satisfied in this case.  Defendants were acting in their official capacities when they created the challenged policy.  Nor is causation in doubt; they were directly responsible for the policy's enactment.  Plaintiff's claim thus turns on whether Defendants' policy violated the Constitution.

Plaintiff, as noted in the introduction, presents two theories.  First, she contends that the policy of permitting cross-sex videotaping of strip searches --

irrespective of whether any viewing of the inmate actually occurred during the taping -- violated the Constitution.  Alternatively, Plaintiff says, the videotaping violated the Fourth Amendment because it in fact did -- regularly and over extended periods of time -- result in male guards viewing female inmates during the strip searches.  Each theory will be addressed below.

A.   <u>Was the Policy of Permitting Cross-Sex Videotaping, Regardless of Viewing, Unconstitutional?</u>

Plaintiff's initial theory is that the searches required by the policy permitting cross-sex videotaping violated the class members' Fourth Amendment rights, even if the male officer doing the videotaping was able somehow to avert his eyes while using the camera.  It must be conceded that the fact scenario posited by this theory is difficult to conjure up.  Nevertheless, this (Defendants say) is what occurred, and a fair analysis of this first, broader theory of recovery must assume, in the light most favorable to Defendants, that any videotaping by male guards occurred without the male actually looking at the female inmate he was filming.

To tackle the argument, two questions must be addressed: first, did the policy generate unconstitutional searches of the class members, and

second, if it did, are Defendants entitled to the protection of qualified immunity?[3]

 1. <u>Was there a constitutional violation?</u>

The Fourth Amendment broadly protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In the narrow context of searches in prison facilities, two interwoven strands of cases are relevant. The first, <u>Bell v. Wolfish</u>, 441 U.S. 520 (1978), provides guidance for courts tasked with determining the reasonableness of a custodial search. The second, <u>Turner v. Safley</u>, 482 U.S. 78 (1978), balances an inmate's rights against the legitimate needs of prison facilities. Though the analyses overlap to some degree, the cases will be discussed separately for the sake of clarity.

---

[3] Defendants believe that Plaintiff's case is a "facial" challenge to the constitutionality of the policy and, thus, Plaintiff can only succeed if she shows that the policy is unconstitutional in every conceivable application. <u>See</u> <u>U.S. v. Salerno</u>, 481 U.S. 739 (1987)(noting that a facial challenge must establish "that no set of circumstances exists under which the Act would be valid"). Though difficult to apply at times, a distinction has emerged between "facial" challenges -- which broadly attack a law or policy regardless of the way it is enacted -- and "as applied" challenges -- those that arise from a specific dispute about a particular way in which a law is implemented. <u>See</u> <u>Wash. State Grange v. Wash. State Republican Party</u>, 552 U.S. 442, 450 (2008). Plaintiff's challenge here is brought on behalf of a class of inmates who believe their rights were violated by the specific manner in which Defendants applied the policy to them. It thus arises from a concrete dispute and fits neatly into the "as applied" category.

a. <u>Bell v. Wolfish</u>

In <u>Bell</u>, the Supreme Court considered the reasonableness of strip searches conducted on pre-trial detainees in state custody. <u>Bell</u>, 441 U.S. at 558. The Court upheld the policy over a Fourth Amendment challenge and, in doing so, identified a number of factors to consider when assessing the reasonableness of these searches. The elements were: (1) the scope of the search; (2) the manner in which it was conducted; (3) the justification for it; and (4) the place where it was conducted. <u>Id.</u> at 559. To evaluate the policy here, the court must weigh the <u>Bell</u> factors.

The first consideration -- the actual scope of the search -- is not the subject of any substantial dispute in the circumstances of this case. The parties agree that a strip search during a transfer to a segregation unit is permissible. <u>See</u> <u>Arruda v. Fair</u>, 710 F.2d 886 (1st Cir. 1983). Moreover, the actual strip searches were completed within a reasonable period of time and were no more intrusive than other, constitutionally permissible searches. <u>Id.</u>

The crux of the challenge is the manner in which the searches were conducted -- that is, with male officers present during the strip searches to videotape the female inmates. In <u>Cookish v. Powell</u>, the First

Circuit considered whether a strip search of a male inmate "conducted within the visual vantage point of female correctional officers" violated the Fourth Amendment. 945 F.2d 441, 442 n.1 (1st Cir. 1991). The search in that case occurred in the immediate aftermath of a prison riot. Id. at 444-45. Though the court ultimately found that the defendants in Cookish were protected by qualified immunity, it described the state of the law as follows:

> (1) inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment and (2) if the observation was other than inadvertent, occasional, casual, and/or restricted, such observation would (in all likelihood) violate the Fourth Amendment, except in an emergency condition.

Id. at 447.

Cookish recognized that, despite their confinement, inmates have some limited expectation of privacy. That right "is violated when guards of the opposite sex regularly observe him/her engaged in personal activities, such as undressing, showering, and using the toilet." Id. at 446; see also Burns v. Loranger, 907 F.2d 233 (1st Cir. 1990); Bonitz v. Fair, 804 F.2d 164 (1st Cir. 1986), overruled on other grounds by Unwin v. Campbell, 863 F.2d 124 (1st Cir. 1988).

Since Cookish, the First Circuit has addressed a
number of challenges to custodial strip searches.  The
Court of Appeals, when considering the reasonableness
of such searches, has consistently recognized the risk
of a constitutional violation posed by the presence of
custodial staff of the opposite sex.  For example, in
Roberts v. State of Rhode Island, the First Circuit
upheld a strip search policy, in part because "the
policy requires the search to be conducted by officers
of the same sex as the inmate."  239 F.3d 107, 112 (1st
Cir. 2001).  Two years later, the First Circuit again
upheld a similar policy because "[i]t was done in a
private area, by a single officer of the same gender,
and without physical contact."  Wood v. Hanock Cnty.
Sheriff's Dep't, 354 F.3d 57, 69 (1st Cir. 2003).

In 2004, the court expanded its analysis by not
merely referencing the gender of the individual
conducting the search, but broadening the focus to
include the environment of the search itself.  In
approving the constitutional legitimacy of the search
in United States v. Cofield, the court noted that "the
officers did not require [the plaintiff] to assume
humiliating poses, [or to] expose himself in an
unnecessarily public place or to members of the
opposite sex."  391 F.3d 334, 337 (1st Cir. 2004).

Defendants' central contention is that these cases only proscribe actual viewing by a guard of the opposite sex. The Constitution, in Defendants' view, does not restrict the mere nearby presence of a male officer during a strip search of a female inmate, even if he is operating a video camera, so long as his eyes are averted.

Defendants read the First Circuit case law too narrowly. Underpinning these authorities is the understandable implication that even the nearby presence of an individual of the opposite sex during a strip search can be, in itself, a deeply humiliating experience. No inmate placed in such a vulnerable and exposed position should have to rely, or comfortably would rely, on the scrupulousness of an officer of the opposite sex turning his or her head as a safeguard to the inmate's privacy and basic dignity.

Any other conclusion would defy human nature. Even if an officer, standing a few feet away and pointing a video camera at an inmate of the opposite sex, did in fact avert his or her eyes from the scene entirely (as perhaps many, or -- as Defendants contend -- all do), the humiliating sense of exposure arising in this situation would be virtually as extreme, from the viewpoint of the inmate, as it would be if the inmate

-17-

knew the officer were actually looking.  It is possible some inmates might not care, but for the vast majority of inmates the scene would reasonably be experienced as painfully degrading.  To suggest otherwise is to ignore the inborn sense of privacy most human beings harbor from childhood through the end of life.

Moreover, in this case -- as Defendant Ashe himself noted -- utilizing a female officer rather than a male unquestionably would add "to the dignity and worth and privacy" of the individual inmate.  (Ashe Dep. 110:20-111:4, Dkt. No. 175 at 44-45, Ex. 6.)

Admittedly, the explicit holding of Cookish is that it is a violation of the Constitution, except in very limited circumstances, when an officer of the opposite sex actually views a strip search.  The case does not suggest, however, that the nearby presence of an officer of the opposite sex pointing a video camera at an inmate during a strip search, and the forced reliance of that inmate on the officer's strict compliance with a procedure requiring him or her to look away during the filming, would satisfy the Constitution.  Cofield's use of the word "exposure" reveals the core value being protected, which is the inmate's privacy and basic dignity, experienced from the inmate's point of view.  The constitutionality of

the search does not hinge solely on what the officer of
the opposite sex happens to see but, instead, on the
degradingly vulnerable position the inmate is forcibly
placed in.

Here, the male official is present during the
entire transition to segregation and the subsequent
strip search.  It is undisputed that the female inmate
is fully aware that a male guard is videotaping her.
Indeed, if she looks, she can see him holding the
camera in her direct line of sight from a few feet
away.  The applicable procedure then requires the
female inmate to strip naked and manipulate her body
while in the direct presence of the male guard
videotaping her.  The inmate will be ordered to lift
her breasts, spread her legs, bend over, and spread her
buttocks.  For the female inmate, the knowledge that
the nearby male is obliged to look away (if, indeed,
she is aware of this restriction) cannot, to any
significant degree, minimize the extreme level of
exposure she experiences.  The fact that the male
officer, while operating the video camera, may be
turned to one side or have his back turned will do
little, for most female inmates, to diminish the sense
of embarrassment, humiliation, and vulnerability that
she must inevitably feel.

-19-

Ultimately then, the constitutional violation here arises from the male video operator's close presence while the female inmate is required "not only to strip naked in front of a stranger, but also to expose the most private areas of her body." <u>Swain v. Spinney</u>, 117 F.3d 1, 6 (1st Cir. 1997). For the reasons stated, the conduct of these searches breached the constitutional boundary to such a degree that, even if the remaining two <u>Bell</u> factors did not favor Plaintiff's position, the policy would still be a violation of the Fourth Amendment.[4] A review of these factors, however, reveals that, for the most part, they favor Plaintiff.

The next factor identified by the Supreme Court is Defendants' justification for the policy. In their initial memorandum (Dkt. No. 159), Defendants noted that 103 C.M.R. § 924.06(3)(f) authorized strip searches upon an inmate's transfer into segregation. Based on this, they argued, the policy was justified.

The problem with this initial argument is that the identified regulation only supports the policy insofar as it calls for the strip searches. No one, not even

---

[4]    It is well established that an emergency situation may justify a search that would otherwise be unconstitutional. As <u>Cookish</u> makes clear, extenuating circumstances may require a male to videotape the search. 945 F.2d at 447. Here however, with only one exception, Defendants do not contend that an emergency ever justified the male presence.

Plaintiff, disputes the propriety of strip searches during transfers to segregation, per se. As invasive as they necessarily are, these searches do not violate the Constitution and, indeed, constitute an appropriate safeguard in the custodial environment. The regulation, however, is silent as to the practice of videotaping these searches and, more importantly, as to the permissibility of an individual of the opposite sex holding the camera.

In their reply memorandum, (Dkt. No. 193), Defendants offer a number of practical justifications for the videotaping policy. Again, however, while videotaping strip searches may, to some extent, be controversial, Plaintiff does not take the position that videotaping itself violates the Constitution. The procedure undoubtedly has advantages. It provides an objective record of the transition into segregation, enhances professionalism, and deters both misconduct and false accusations of misconduct. None of these purported justifications, however, covers the use of male staff to videotape female inmates.

Only one asserted justification bears directly on the issue of the officer's gender. The ability to utilize a male officer to videotape females during strip searches, Defendants contend, provides

-21-

flexibility during potentially urgent situations. A
transfer to segregation can be fraught with risk;
serious problems can arise quickly and unpredictably.
The possible use of a male guard to handle videotaping
-- a male instructed to look away while conducting the
taping -- helps to ensure the safety and security of
staff and inmates.

To buttress this point, Defendants point to one
event in 2013 where an immediate need arose to transfer
an inmate to segregation, but no female officer was
available to handle the videotaping. The flexibility
of the policy permitted a male officer to hold the
camera and complete the transfer promptly. This
prevented a potentially dangerous situation from
spinning out of control.[5]

The shortcoming in this legal argument is that
Plaintiff does not dispute the constitutional
legitimacy of cross-sex videotaping in a true
emergency. All the case law recognizes this
regrettable but necessary contingency. Moreover, as a
factual matter, the record provides no support for the
suggestion that, at least prior to 2013, videotaping of
strip searches by male officers was limited to urgent

---

[5] Defendants offer additional justifications under the
Supreme Court's <u>Turner</u> decision, which are addressed
below.

situations.  In fact, the record confirms that female officers were not only available but actually present during the vast majority of strip searches.  The evidence also demonstrates that Defendants employed female officers at a roughly similar rate as male officers.  Critically, no evidence in this record suggests that the lack of a female officer would have required postponement of a transfer, or generated any risk, in any but the rarest of circumstances.

Moreover, if male guards were potentially needed in emergency situations to effectuate swift moves –- a situation Plaintiff concedes might require cross-sex videotaping –- this contingency still would not justify the challenged policy.[6]  The 2013 event described by Defendants, one that occurred well after Defendants altered their policy, illustrated the feasibility of a narrowly crafted exception covering a truly urgent situation.  It does not, however, provide support for a carte blanche license to use male guards regularly to videotape strip searches of female inmates.

---

[6] Defendants take issue with Plaintiff's narrow definition of an emergency.  The court need not address this disagreement since it is undisputed that no emergency, however defined, precipitated the searches at issue in this case.

-23-

In sum, Defendants' attempt to offer justifications
for their policy is flatly inadequate to provide a
bandage for its constitutional deficiencies.

The final <u>Bell</u> factor is the location of the
searches.  The policy, as noted, provides two different
locations where the searches can occur, the segregation
unit itself and the intake area.  Plaintiff contends
that both areas are too public; Defendants disagree.
The importance of this issue may be secondary compared
to the gender issue and, in any event, the parties'
disagreement raises an issue of fact.  Notably, even
assuming Defendants are correct, it would still not
save the policy given the unreasonableness of the
manner of the searches, and thus the disagreement does
not implicate any material fact precluding entry of
summary judgment.

To summarize, examination of the <u>Bell</u> factors
establishes that the strip searches of class members in
this case, to the extent they occurred with male
officers in the immediate vicinity conducting
videotaping, were unreasonable regardless of whether
the officers actually viewed the inmates.  Plaintiff's
Fourth Amendment rights were violated by the mere
presence of a male officer nearby conducting the
videotaping during her strip search.  Since Plaintiff's

rights were violated, the analysis shifts to the <u>Turner</u> case.

### b. <u>Turner v. Safley</u>

Although the policy violates Plaintiff's Fourth Amendment rights, that finding must still survive the <u>Turner</u> analysis. At issue in that case was, <u>inter alia</u>, the permissibility of restricting an inmate's right to marry. The Court's holding, broad in nature, is relevant here.

In determining the permissibility of a prison regulation, the Court said, "[W]hen a prison regulation impinges on an inmates' constitutional rights, the regulation is valid if reasonably related to legitimate penological interests." <u>Turner</u>, 42 U.S. at 89. <u>Turner</u> provided four factors to be weighed in making that determination: (1) whether there exists a valid, rational connection between the regulation and the governmental interest; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) the impact the demanded accommodation would have on the facility, staff, and inmates; and (4) the availability or absence of ready alternatives to the complained of policy. <u>Id.</u>

Defendants believe that each factor illuminates a reasonable relationship between their policy and a

valid, penological interest.  Plaintiff, meanwhile, contends that Defendants have the weaker argument on each factor and that she is, at a minimum, entitled to partial summary judgment on the question of whether any emergency or legitimate interest justified the searches.

As to the first factor -- the connection between the policy and the goal -- Defendants reiterate their argument that videotaping the searches is justified and that male guards are a critical component to carrying out that policy.  Moreover, they assert that the use of males permits flexibility in staffing and ensures that the WCC can provide equal employment opportunities.

These arguments are unpersuasive.  Though videotaping itself may be appropriate, nothing supports the conclusion that male guards need to be utilized to conduct the videotaping outside of emergency situations.  Indeed, since this litigation began, Defendants have essentially adopted a policy requiring only female guards to videotape the searches and have not encountered any problems.

Defendants' employment-related arguments rely solely on speculation.  The record offers no examples of employees complaining about their assignments; no data evidences staffing problems.  Nothing in the

record suggests that permitting males routinely to videotape strip searches enhanced employment opportunities for anyone.  Therefore, Defendants have failed to establish a valid connection between the policy and their purported goals.

The second _Turner_ factor, the existence of an alternative to exercise the identified constitutional right -- in this case, the right to be free from an unreasonable search -- favors Plaintiff.  Defendants have conceded that their policy left no room for an alternative method to exercise this right.  <u>Bull v. San Francisco</u>, 595 F.3d 964, 973 n.9 (9th Cir. 2010)(stating that the right to be free from an unreasonable search "is not a right susceptible to exercise by alternative means").

With respect to the third _Turner_ factor –- the impact the demanded accommodation would have on the facility, staff, and inmates –- Defendants repeat their argument that, in order to avoid compromising the operation of their facility, their only feasible option was to restrict male guards from _viewing_ female inmates during strip searches, not from videotaping them.  This rule, they point out, was already in place at the time this lawsuit was filed and was sufficient.  Any other accommodation, such as excluding males entirely from

videotaping strip searches (except in an emergency or
otherwise urgent situation), would, Defendants argue,
have reduced Defendants' flexibility and undermined
security.

The flaw in this argument, as this memorandum has
already noted, is that the record offers no support for
Defendants' contention that utilizing female guards for
videotaping strip searches decreased Defendants'
ability to effectuate transfers to segregation in non-
urgent situations.  On the contrary, Defendants'
current policy of strictly limiting the presence of
males during strip searches has shown that the
overwhelming majority of transfers to segregation can
be managed easily within constitutional boundaries.
Plaintiff's proffered alternative to the policy as it
existed at the time this lawsuit was filed was clearly
a feasible accommodation that minimally burdened the
facility, staff, and inmates.

On the final Turner factor -- the availability and
benefits of ready alternatives –- Defendants argue that
no available alternative would have provided the same
benefits as the challenged policy.  Defendants itemize
a number of options they consider inferior to
videotaping: an audio recording, not utilizing a
camera, using a tripod, or using a ceiling camera.

-28-

They believe that each alternative would present serious problems. An inmate could say something false on an audio recording; an emergency might arise that would need to be documented on camera; the tripod could be used as a weapon; a ceiling camera would actually be more invasive. In sum, a video camera held by a person, Defendants say, was the only option that, as a practical matter, accomplished Defendants' goals.

Defendants' contentions may all very well be true, but they miss the point. At the risk of repetition, this dispute is not about the propriety of videotaping the searches per se. It is about who should be holding the camera. Since the only real alternative is to require female guards to hold the camera except in cases of emergencies, and Defendants have failed to show why this would not be feasible -- indeed, such a policy appears to have effectively been adopted at this point -- the court must conclude that the final Turner factor manifestly favors Plaintiff.

As a final plea, Defendants suggest that deference under Turner is particularly appropriate here for a number of reasons. First, Defendants utilized an expert when drafting the regulations to ensure that they were legally permissible. Second the WCC has applied for and received accreditation from the

-29-

American Correctional Association, which did a complete review of every policy and procedure, including the policy governing videotaping.  Finally, the Massachusetts Department of Corrections audited the WCC twice a year, and no issues respecting the policy were ever flagged.

None of these reasons justifies deference to the particular policy at issue.  First, use of an expert, though prudent, cannot innoculate an unconstitutional policy.  Here, in any event, a particular irony adheres to this argument since Defendants' expert explicitly warned that the policy presented both practical and legal problems.  (Dkt. No. 175, Ex. 28 at 15.)

Defendants' other arguments essentially assert that since no one who reviewed the policy found a problem with it, no problem existed.  Again, while the use of review by outside entities reflected prudence and professionalism on the part of Defendants, the fact that these entities did not condemn the videotaping policy obviously cannot, ipso facto, render it constitutional.

In sum, no legitimate penological interest justified the regular practice of using male officers to videotape female inmates while they were being strip searched, even assuming the officers respected the

-30-

policy requirement to avert their eyes while operating the camera.  Moreover, nothing in the record indicates that any emergency situation ever required the use of male officers to handle videotaping.  Since the policy violated the Fourth Amendment rights of the class members, and since Turner does not save Defendants, the policy as applied to class members was unconstitutional.

2.  Qualified Immunity

Qualified immunity protects officials performing discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer should have known. Wilson v. Layne, 526 U.S. 603, 609 (1999).  Qualified immunity is not appropriate where (1) an official violated a constitutional or statutory right, and (2) the right was "clearly established" at the time the impermissible conduct occurred.  Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011), citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Defendants contend that qualified immunity is appropriate here for two reasons.  First, the legal question at the heart of this case is obscure, and no

clearly established law existed at the time of the
violation. If anything, Defendants say, the law
supported their approach since courts have consistently
upheld the use of video cameras to record searches.
See, e.g., Powell v. Cusimano, 326 F. Supp. 2d 322, 335
(D. Conn. 2004). Second, Defendants say, they strived
to ensure that the policy complied with the
Constitution -- for example, they hired an expert and
had the procedures audited -- and therefore acted
reasonably in concluding that it was permissible.

Though Defendants' argument has some traction, it
is ultimately unpersuasive. They essentially concede
that, at the relevant time period, the Constitution
clearly prohibited males from conducting strip searches
of female inmates, or from viewing the strip searches,
except where such viewing was inadvertent or in
emergency situations. These cases, they argue, were
insufficient to put them on notice that the practice of
having a male officer videotape a strip search of a
female inmate without looking at the inmate violated
the inmate's rights.

On the question of when a constitutional right is clearly established, the Supreme Court has emphasized that "a case directly on point" is not required. Ashcroft, 131 S.Ct. at 2083. Instead, the inquiry is whether the law "placed the statutory or constitutional question beyond debate."

At the time of this constitutional violation, clearly established law prohibited a male officer from viewing a female inmate during a strip search. Cookish, 945 F.2d at 447. It was also plainly unconstitutional to require a female inmate to expose herself, particularly to the extreme degree required during a strip search, in the presence of a male officer. Cofield, 391 F.3d at 337. Given these cases, any reasonable official would have recognized the unreasonableness of requiring a female inmate to strip in the presence of a male officer holding a video camera and pointing it at her. The unconstitutionality of such a policy was, quite simply, "a foregone conclusion." Bonitz, 804 F.2d at 173 n.10. Given the clarity of the law at the time the policy was put in place, a reasonable official would have been properly

on notice that the policy would inevitably result in an unconstitutional search.

Moreover, even if the state of the law were ambiguous -- which it was not -- this policy was so clearly "antithetical to human dignity" that qualified immunity would still be inappropriate.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).  Any reasonable official viewing the policy would have concluded that it had the potential to humiliate and demean the female inmates. However sincere Defendants' attempts to comply with the law may have been, it was unreasonable for them to neglect the obvious ramifications of their policy.

Ultimately, a reasonable individual in Defendants' position could <u>not</u> have concluded that permitting male officers to videotape female inmates during strip searches -- even if the officers looked away -- was constitutional.  Therefore, Defendants are not entitled to the protections of qualified immunity, and Plaintiff is entitled to judgment as a matter of law.

B.   <u>Was the Policy Unconstitutional Because It Foreseeably Led to Cross-Sex Viewing of Strip Searches?</u>

The court's ruling on Plaintiff's first theory
makes extended discussion of her second theory
unnecessary. Plaintiff asserts that the videotaping
policy was also unconstitutional because it in fact
inevitably led to male officers actually viewing, in a
manner that was not merely incidental or inadvertent,
strip searches of female inmates in non-emergency
situations.

As a legal matter, if Plaintiff's assertions were
shown to be true -- *i.e.*, male officers regularly
viewed female inmates during strip searches -- she
would be entitled to judgment in her favor. <u>Cookish</u>
and its progeny, as discussed, undisputedly hold that
in non-emergency situations cross-sex viewing that is
more than incidental or inadvertent violates the
Constitution. <u>Cookish</u>, 945 F.2d at 447. Qualified
immunity would certainly not protect Defendants given
this case law.

Summary judgment, however, would not be available
on this alternate theory on the current record of this
case, based on two disputed issues of fact: did the
policy result in actual viewing that was more than

incidental or inadvertent, and, if so, were these specific Defendants legally responsible for the viewing?  Plaintiff relies on the testimony of five class members, the videos themselves, and testimony by a former WCC officer to support her position. Defendants, in turn, provide testimony from eleven officers to the effect that male guards handling videotaping did not routinely view female inmates during searches.  Moreover, Defendants argue, any viewing that did occur was incidental and therefore insufficient to create a pattern or practice of unconstitutional conduct for which these Defendants would be liable.

On Plaintiff's second theory, if this case went to trial, Defendants might have their work cut out for them.  The notion that a male officer could successfully perform the job of videotaping a female inmate's strip search (and keep the camera focused on the neck up as the policy required) without actually observing the search seems, to put it mildly, dubious. The practical demands of the task, keeping the camera steady and trained on the correct location in the cell,

would make this argument a hard sell to a jury.  Of

course, as the court has already noted, the degrading

exposure of the female inmate placed in this position

should have made the constitutional violation inherent

in this practice manifest to Defendants.  Nevertheless,

to the extent that Plaintiff offers actual viewing as a

basis for her claim of a violation of § 1983, the

record contains sufficiently documented disputed issues

of fact to render summary judgment inappropriate on

this alternate theory.

### IV.  CONCLUSION

Managing a correctional facility is a uniquely

difficult task, and Defendant Sheriff Michael J. Ashe

Jr., has a well deserved reputation not only for highly

competent administration but for sensitivity to the

rights and the welfare of the inmates he is responsible

for.  The hallmark of his long tenure as Sheriff has

been scrupulous attention to the dignity of every

inmate, consistent with the operational requirements of

the particular facility.

Unfortunately, in this case a misjudgment occurred

resulting in a policy that clearly transgressed the

Constitution and injured the plaintiff class.  For this reason, Defendants' Motion for Summary Judgment (Dkt. No. 156) is hereby DENIED, and  Plaintiffs' Motion for Summary Judgment (Dkt. No. 171) is hereby ALLOWED on the issue of liability.

By September 9, 2014, Plaintiff shall submit a proposed schedule to address the questions of potential equitable relief and monetary damages.  If Plaintiff's proposal is not assented to, Defendants may submit their counter-proposal by September 23, 2014.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge
